UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

TATIANA ZOLONDEK,

            Plaintiff,

   -against-

WORLDWIDE FLIGHT SERVICES, INC.,

            Defendant.
--------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ AUG 28 2006 ★

**BROOKLYN OFFICE**

**REPORT AND RECOMMENDATION**
**02 CV 2030 (DLI)(LB)**

**BLOOM, United States Magistrate Judge:**

## INTRODUCTION

    Plaintiff, Tatiana Zolondek, brings this employment discrimination and civil rights action pursuant to 42 U.S.C. § 1981 ("Section 1981"); the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, New York Law §§ 290 et seq. ("NYSHRL"); the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq. ("NYCHRL"); and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et. seq. ("FMLA"). Amended Complaint at ¶1. Plaintiff alleges disparate treatment based upon her race (white) and national origin (Russian); retaliation; sexual harassment and that she was terminated in violation of the FMLA. The defendant moves for summary judgment under Fed. R. Civ. P. 56. The Honorable Dora L. Irizarry referred the motion to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the reasons discussed below, I recommend that defendant's motion for summary judgment should be granted in its entirety and that this action should be dismissed.

1

## BACKGROUND

Plaintiff commenced her employment with Worldwide Flight Services, Inc., (hereinafter "Worldwide") on April 3, 2000 as a Cargo Sales Agent at John F. Kennedy International Airport (hereinafter "JFK") and worked in this position until she was terminated on or around September 17, 2001. Amended Complaint at 2. Worldwide performs a variety of airline services, including ground handling of commercial passenger aircraft, cargo handling, passenger handling, security and cabin service at JFK. See Defendant Worldwide's Rule 56 Motion Exhibits, Zozzaro Declaration, Exhibit "A", ("Def's Exhibit "A").

Plaintiff alleges that during her tenure at Worldwide, she was subject to disparate treatment because she is Russian and white. This discrimination took the form of jokes made at plaintiff's expense, constant ridicule, denigration, disparagement and scorn by both plaintiff's co-workers and supervisors. Plaintiff alleges that despite her complaints of harassment and disparate treatment, defendant failed to take corrective action and the harassment by plaintiff's co-workers and supervisors intensified. In addition, plaintiff alleges that she suffered discrimination regarding her shift assignments, job training, days off and uniform requirements. Amended Complaint at 2.

Plaintiff also alleges that she was sexually harassed by two co-workers and a supervisor and that although plaintiff complained of sexual harassment and a hostile work environment, defendant failed to take appropriate and effective remedial action. Amended Complaint at 2. Finally, plaintiff alleges that she was subject to retaliation for filing two EEOC complaints on June 18, 2001 and on July 27, 2001 (See Def's Exhibits "W" and "X") and that her termination violated the FMLA. Amended Complaint at 2.

Defendant contends that summary judgment is appropriate because the instant record establishes that plaintiff was terminated for failing to report to work and failing to follow Worldwide's policies; that Worldwide maintained a diverse work environment; that it actively sought Russian workers; that it maintained and provided all of its employees with sexual harassment and discrimination prevention policies and practices and that, "throughout plaintiff's employment tenure Worldwide attempted to accommodate plaintiff's myriad requests regarding assignments, shifts and leaves." Memorandum of Law Submitted in support of the Defendant's Rule 56 Summary Judgment Motion ("Def's Memo of Law") at 2.

Defendant also contends summary judgment is proper because plaintiff failed to utilize Worldwide's harassment procedures by filing formal complaints and that this failure provides defendant with a defense to all of plaintiff's sexual harassment claims; that plaintiff's national origin claims are not covered under § 1981; and that the filing date of plaintiff's June 18, 2001 EEOC charge renders all of plaintiff's pre-August 22, 2000 Title VII claims time-barred.

Plaintiff originally filed her complaint *pro se.* Soon after, plaintiff retained Kathleen Peratis as counsel and on September 30, 2002 counsel filed an amended complaint. On December 9, 2002 counsel advised the Court that the plaintiff no longer wished to be represented by her and the Court granted counsel's application to withdraw. Plaintiff represented herself throughout the remainder of this litigation.


**STANDARD OF REVIEW**

Summary judgment should be granted if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56( C). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997) (quoting Anderson, 477 U.S. at 248 ); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Celotex Corp. v. Cadrett, 477 U.S. 317, 322 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000). For the purposes of summary judgment, the facts here are viewed in the light most favorable to plaintiff.

"An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita, 475 U.S. at 586-87 (1986). In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Niagra Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

4

The Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should issue in an employment discrimination action. Gallo v. Prudential Residential Services, 22 F.3d 1219, 1224 (2d Cir. 1994); see also Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829 (1985). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, the court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination." Gallo at 1224. When a party is proceeding *pro se*, the Court is obliged to "read his supporting papers liberally, and will interpret them to raise the strongest arguments they suggest. Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

## TITLE VII

Plaintiff alleges claims of disparate treatment, sexual harassment, retaliation and wrongful termination. All of these claims require a showing of the same core elements as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973). The Supreme Court held in McDonnell Douglas that

the complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (I) that he belongs to racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802. Assuming that a complainant establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-

5

discriminatory reason for its actions. Id.; see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07, 113 S. Ct. 2742 (1993).

The elements set forth above are not a rigid, unyielding standard. "Every action pursuant to Title VII will differ materially in the specific acts complained of, the type and severity of the unlawful actions alleged and the specific kinds of harm cognizable under the statute." Sanders v. City of New York, 200 F. Supp. 2d 404, 496 (S.D.N.Y. 2002). McDonnell Douglas still provides the baseline analysis for actions pursuant to Title VII. The Court addresses each of plaintiff's claims below, but finds that plaintiff has failed to establish a *prima facie* case under McDonnell Douglas for any of her claims.


## DISPARATE TREATMENT BASED ON NATIONAL ORIGIN AND RACE

Plaintiff commenced her at will employment with Worldwide on April 3, 2000 as a Cargo Sales agent at JFK airport. She was interviewed by and ultimately hired by a Worldwide employee named Irene, who was white and of Russian origin. Plaintiff's Deposition and Corrections, Part I, Def's Exhibit "F" at 25 (hereinafter "Depo. 1 at ___"). Worldwide, as part of its EEOC policy and practices, conducts an orientation and training program for all its JFK employees, including Cargo Sales Agents, at the commencement of their employment. Def's Exhibit "D", Equal Employment Opportunity Policy and a Policy Against Harassment; Def's Exhibit "A", Zozzaro Declaration. Plaintiff admitted that she attended the training (Depo. 1 at 31) and thereafter signed a document acknowledging that she had received receipt of Worldwide's rules and regulations regarding sexual harassment and had attended and understood her EEOC orientation training which outlined the procedure for filing harassment claims. Def's.

6

Exhibits "A" & "E".[1]

It is uncontroverted that Worldwide attempts to maintain a diverse workforce. Defendant

has presented evidence that it "actively recruits Russian employees by advertising in Russian

newspapers" and enlists agencies that place Russian workers in jobs. Def's Exhibit "A". In

addition, defendant has presented evidence that it has solicited employees of diverse national

origin by advertising in the Korean Times, in newspapers that promote the Puerto Rican Day

Parade and in Russian newspapers and publications generally.[2] Def's Exhibit "G".

In April 2000, plaintiff was assigned to Building 79, a cargo building operated by Nippon

Cargo Airlines. Plaintiff contends that Carlton Ramsey, her immediate supervisor,

discriminated against her because she was white and Russian from her first day on the job.

Plaintiff alleges that Ramsey discriminated against her by constantly laughing at her: "He all was

laughing. He try to be serious, but he always laughing. Because he like, um, take my language. .

. Later I saw how he spoke with my supervisor and my back laughing, watching me and like that,

and show like that laughing." Depo. 1 at 47. In his deposition, Ramsey denies ever laughing at

plaintiff and states that plaintiff never utilized Worldwide's discrimination complaint procedures

regarding any aspect of her employment in Building 79. Def's Exhibit "H".

Plaintiff also contends that Ramsey discriminated against her by refusing to give her the

shift and days off that she requested. Specifically plaintiff alleges she requested a morning shift

---

[1] In her deposition, plaintiff first maintained that she received three days of training, then
later stated that she was absent for the sexual harassment training, but signed the
acknowledgment that she attended anyway. Depo. 1 at 30-32.

[2] One Worldwide advertisement, directed to the Russian community, reads: "Let Your
Career Take Off! Worldwide Flight Services Proudly Salutes the Jewish Community of the
Former Soviet Union." Def's Exhibit "G".

and either Friday/Saturday or Saturday/Sunday off.[3]  However, plaintiff concedes that the shift and day off assignments were implemented based on availability and company operational needs. Def's Exhibit "H", Ramsey Declaration; Depo. 1 at 34, 42-43. Approximately one month after she began her employment, plaintiff also concedes that Ramsey gave her the shift (mornings) and days off (Friday & Saturday) that she initially requested. Depo. 1 at 50.

Unfortunately, plaintiff's satisfaction with her shift was short lived as her new morning supervisor, Maria Adma, allegedly began discriminating against her.  Ms Adma discriminated against plaintiff by way of unspecified "hints" and "feelings" because plaintiff is white and Russian and also because Ms. Adma refused to allow plaintiff to receive additional training. (Depo. 1 at 52-68). Plaintiff alleges that employees Jody Macmillan and Carolyn Jackson also constantly laughed at her and denied her training allegedly because she is Russian and white. Plaintiff admits however, that although she attributes everyone's laughter to the fact that she is white and Russian, she never actually heard any of these employees say anything discriminatory to her nor did she complain formally that employees were laughing at her or that she was denied training. [4] Depo. 1 at 65.

On December 27, 2000, plaintiff was transferred to Building 78, the Saudi Air Building, where plaintiff's job title, salary and duties remained the same.[5] Def Exhibit "J"; Depo. 1 at

---

[3] Plaintiff alleges that she requested Saturday off for religious reasons, but has alleged no allegations in her complaint or amended complaint based on religion.  Therefore, no claim of discrimination based on religion is presented.

[4]  Although plaintiff states that she did not complain in order to avoid trouble, plaintiff later states that she "complain[ed] all the time." Depo. 1 at 113.

[5] The sole difference between the working conditions in Building 79 and Building 78 appears to be that the computers in Building 79 were old.  Depo. 1 at 116.

71,117. Plaintiff alleges that she was transferred as a result of her sexual harassment complaint against a fellow employee: "After I complained, I think they were looking for a reason. They were looking for any reason, for any first reason in order to transfer me, and when the first reason came about, they transferred me." Depo. 1 at 112. [6] Defendant contends that plaintiff was transferred because of customer complaints that plaintiff was rude and inattentive. Def. Exhibit "H".

The assignment to Building 78 lasted for little over one week. After approximately one week of work at Building 78, plaintiff called out sick for approximately one week and then returned to the building for two days before she was transferred to Building 9. Plaintiff contends that the transfer was a "shock" that made her ill (Depo. 1 at 120) and that when she returned from sick leave, she was again discriminated against by her supervisors watching her in a "very nasty" manner. Depo. 1 at 124. Plaintiff admits that she was given Friday and Saturday off while in Building 78, but states this happened only after she complained. Depo. 1 at 127.

On January 3, 2001, plaintiff was transferred to Building 9 (Korean Airlines) where plaintiff's immediate supervisor was Dawn Callender. There plaintiff was initially assigned an evening shift with Saturday and Sunday off. Plaintiff requested a morning shift and was informed by Callender that plaintiff's request would be granted as soon as an open shift became available. Approximately one month later, plaintiff received the morning shift and the days off that she requested. Plaintiff however contends that this one month delay was the result of discrimination by Callender. Depo. 1 at 133; Callender Affidavit at Def Exhibit "K".

Plaintiff also states that Callender discriminated against her by reprimanding her when

---

[6] This allegation is discussed at length, *infra.*

she failed to wear her uniform and by refusing to train her for a position with Czechoslovakia Air. More specifically, plaintiff states that she was unfairly singled out for not wearing her uniform because she is white and Russian when other co-workers were allowed not to wear their uniforms. In her deposition, plaintiff admits that sometimes she did not wear her uniform: "Sometimes I do not. I said what's the big deal, different people put on different clothes. What I do wrong?" Depo. 1 at 158. It is uncontroverted however that Worldwide has a uniform requirement and that plaintiff was required to wear a uniform. Def's. Exhibit "K", "M" and "N". In addition, plaintiff's allegation that she was unfairly singled out because she is white and Russian is belied by her own statement that her fellow Russian co-worker, "Oleg" was never reprimanded and "never put on any kind of uniform". Depo. 1 at 159.

Plaintiff also states that she asked for but did not receive the necessary training to obtain a position with Czechoslovakia Air and that this failure to train was discriminatory and based on her race and national origin. Again these allegations are belied by plaintiff's statements that her Russian co-worker, "Oleg" was trained for the assignment instead of plaintiff and that on April 9, 2001, plaintiff received the position she had requested with Czechoslovakia Air. Depo. 1 at 168. She further admits that she was second in line, after Oleg, for the position. Depo. 1 at 168.

Shortly after receiving the Czechoslovakia Air assignment, on May 20, 2001, plaintiff requested a one month "vacation/leave of absence without pay" to visit her mother in Russia. Def's Exhibit "O". This request was granted by Callender on June 9, 2001. In the letter granting the request, Callender told her that although the request was approved, she could not guarantee that plaintiff would receive the same shift and days off that she presently held on her return. Def's. Exhibit "P". However, when plaintiff did return from her leave of absence, her shift and

days off were unchanged. Nevertheless, plaintiff points to this action as discriminatory. Callender states that she "bent over backwards to accommodate [plaintiff's] specific needs, i.e. tried to give her the shift and day off assignments she wanted, granted her a month leave of absence in June 2001, etc. Additionally, I reprimanded all employees if they failed to wear their uniform and often sent them home." Def's Exhibit "K".

During her tenure at Building 9, in addition to the sexual harassment allegations against Leonetti and Banamo, discussed *infra*, plaintiff alleges that she was subject to disparate treatment because of her race and national origin by the following individuals: Dawn Callender; Jody Macmillan; Carolyn Jackson; her supervisor, "Kathleen", Joan Colin; Maria Marriott and Galina Maria Matteo. Again, the bulk of the allegations against these individuals were that they laughed at plaintiff, "hinting" of discrimination and that she "felt" discriminated against. Depo. 2 at 30-32. However, plaintiff also admits that there were no discriminatory comments made to her and that she did not over hear any discriminatory comments about her. Depo. 1 at 208-209. [7]

Plaintiff contends that the discrimination she faced was the result of a conspiracy by management and supervisors to create a hostile work environment based on her race and national origin: "The supervisors, they were controlling these small people, the people from management, they were controlling them and they were using them in order to provoke something that would

---

[7] Plaintiff alleges that she secretly taped conversations with Worldwide employees, including Callender, and that employees did the same to her, although she admits she has no proof of being taped: "Nobody told me, but it was my conclusion based on how careful, how cautious they were when they were talking to me." Depo. 2 at 32, 105. Plaintiff never produced these tape recordings during discovery and as such they are not a part of the Court record. Materials that are not disclosed during discovery do not have probative weight and should not be considered by the Court as a matter of law. See Malaco Leaf, AB v. Promotion in Motin, Inc., 287 F. Supp. 2d 355, 375-76 (S.D.N.Y. 2003) (court refused to consider any evidence proffered for the first time on summary judgment).

give them grounds to lay me off." Depo. 2 at 34.

Plaintiff returned from her leave of absence on July 16, 2001. Shortly thereafter, plaintiff complained to Callender and other supervisors about her co-workers laughing at her. Depo. 2 at 41. Callender responds that she and another supervisor addressed plaintiff's concerns at a general meeting: "[o]ur investigation of this matter revealed that both plaintiff and her co-workers sometimes spoke to their co-workers or customers in their native language. Our investigation confirmed my personal observation that no Worldwide employee made fun of or 'laughed' at Ms. Zolondek." Def's. Exhibit "K"; Exhibit "L" Supervisor's Records, September 6-7, 2000; Depo. 1 at 143-146; Depo. 2 at 43.


## DISCUSSION

In order to establish a prima facie case of discrimination based on disparate treatment in violation of Title VII, plaintiff must show that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties of her position; (3) she was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Stern v. Trustees of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997) (citations omitted); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted). The evidence plaintiff presents herein is insufficient to establish that she was subject to an "adverse employment action" within the meaning of Title VII.

For an employer's action to be adverse, it must rise above mere inconvenience to a dissatisfied employee. The action complained of must cause a materially adverse change in the terms and conditions of employment. Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640

(2d Cir. 2000). An adverse employment action is a "materially adverse change in the terms and conditions of employment." Galabya, 202 F.3d at 640 (internal quotation marks omitted). To be "'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal quotation marks omitted). Such a change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (internal quotation marks omitted).

Plaintiff has failed to establish that she was subject to an adverse employment action because she is white and Russian. The record evidence establishes that Worldwide attempted to accommodate plaintiff's requests for days off and shift assignments. In addition, plaintiff's request for a leave of absence and to work for Czech Air were granted. In fact, plaintiff has failed to establish that defendant denied any of her requests. That plaintiff's requests were not granted the moment they were made does not give rise to an adverse employment action.

Moreover, plaintiff suffered no adverse consequence, either to her career prospects or economically, as a result of her transfers, and indeed, plaintiff apparently benefitted from the transfer to Building 9. Plaintiff's job title and salary remained the same upon transfer. At most, plaintiff has contended that the transfer to Building 78, which lasted approximately one week, was less appealing because the physical plant of the building and the computers were older. "[A] transfer that does not change the conditions of employment is mere inconvenience or an alteration of job responsibilities and hence [is] not materially adverse. Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (citations omitted). These inconveniences, to the extent that they

13

could be viewed as such, do not rise to level of a materially adverse change to plaintiff's employment.

Training is a benefit of employment under Title VII protection. 42 U.S.C. § 2000e-2(d). See Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 161 (2d Cir.), cert. denied, 502 U.S. 880, 116 L. Ed. 2d 185, 112 S. Ct. 228 (1991) (Company on-the-job training practices may evidence Title VII violation). To present a *prima facie* case based on her employer's failure to train, plaintiff must show, in addition to her protected-class status, that Worldwide offered training to its other employees and that plaintiff was denied that training under circumstances that give rise to an inference of discrimination. See Lopez, 930 F.2d at 161.

Plaintiff fails to establish that she was denied job training under circumstances that give rise to an inference of discrimination. In the first instance, plaintiff does not specify what training she was denied and how it affected her position with Worldwide. In addition, plaintiff proffers no evidence to show that she was denied training programs because of her race or national origin. In fact, plaintiff admits that the person who received training ahead of her, Oleg, was both Caucasian and of Russian origin. These facts are fatal to plaintiff's claim that defendant denied her training based on her race and national origin. Lopez, 930 F.3d at 161.

To the extent that plaintiff makes a failure to promote claim, this allegation is not supported by the instant record. Plaintiff sought and received a position with Czechoslovakia Air. Again, the fact that she did not receive it immediately upon her request is of no moment. And, again, the fact that her white and Russian co-worker, Oleg, received the assignment before she did is fatal to plaintiff's allegation of disparate treatment based on race and national origin. See McNair v. NYC Health and Hospital Co., 160 F. Supp. 2d 601, 605-606 (S.D.N.Y. 2001)

(no showing by plaintiff of disparate treatment of any similarly situated employee fatal to claim).

Plaintiff's allegations regarding being singled out for not wearing a uniform must likewise fail. First, it is uncontested that Worldwide has a uniform requirement. It is not an employee's prerogative to decide that not wearing a required uniform is "no big deal." In addition, plaintiff again contradicts her disparate treatment claim by admitting that Oleg, a similarly situated employee, was *not* disciplined for failing to wear a uniform. "It hardly needs saying that a criticism of an employee . . . is not an adverse employment action." Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001).

Much is made by plaintiff of her allegations that her co-workers often laughed at her. Plaintiff however presents no evidence that this behavior by her co-workers (or her supervisors) was the result of discrimination. Plaintiff admits she heard no discriminatory comments and an investigation launched by plaintiff's supervisors revealed only that the co-workers often laughed amongst themselves when they conversed in their native tongues. Plaintiff's allegations that her co-workers were laughing at her, even if true, cannot support her claim of unlawful discrimination based on her race and national origin. Insensitivity on the part of co-workers, while unpleasant, does not give rise to an inference of discrimination. See B.F. Goodrich v. Betkoski, 99 F.3d 505, 513-14 (2d Cir. 1996); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995). None of the acts described by plaintiff constitutes an adverse employment action. Plaintiff has failed to make any specific allegations or to provide any particularized admissible evidence to support her discrimination claim. Meiri 759 F.2d at 998 ("purely conclusory allegations of discrimination, absent any concrete particulars" cannot preclude summary judgment), cert. denied, 474 U.S. 829 (1985).

Plaintiff describes numerous non-specific events based on her "feelings" and states that there were many "hints" that she was discriminated against by supervisors and co-workers. It is well-settled that a plaintiff's speculations, generalities and gut feelings, however genuine, when unsupported by specific facts, do not allow for an inference of discrimination. See Lediju v. N.Y. City Dep't of Sanitation, 173 F.R.D. 105, 114 (S.D.N.Y. 1997); Burrell v. Bentsen, 894 F. Supp. 750 (S.D.N.Y. 1995), aff'd, 50 F.3d 3 (2d Cir. 1995). As the Second Circuit has explained, "to allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." Meiri, 759 F.2d at 998. Plaintiff cannot "defeat a motion for summary judgment by offering purely conclusory allegations of discrimination." Id.; McLee v. Chrysler Corp., 38 F.3d 67 (2d Cir. 1994) (reaffirming the availability of summary judgment in discrimination cases).

Plaintiff's responsive papers, although voluminous, are as bare as they are conclusory in establishing a *prima facie* case of discrimination. Plaintiff offers no evidence of discriminatory animus or of disparate treatment and relies solely on conclusory declarations and supporting affidavits that would not be admissible at trial and cannot not be considered here. See Fed. Rule Civ. Pro. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). See also, Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 156 (2d Cir. 1999); Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d. Cir.), cert. denied, 528 U.S. 965, (1999); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985).

As plaintiff has failed to establish a *prima facie* case of discrimination based on her race

or national origin, defendant is entitled to summary judgment on plaintiff's disparate treatment claims. See Meiri, 759 F.2d at 997-98; Lediju, 173 F.R.D. at 114-15. Accordingly, plaintiff's claims based on race and national origin discrimination should be dismissed.


## SEXUAL HARASSMENT

Plaintiff alleges that she was subjected to sexual harassment by two co-workers and a supervisor during her tenure at Worldwide: Johnny Gonzales, a co-worker, who allegedly harassed plaintiff from the inception of her employment in April, 2000 to at least May of 2000; Frank Leonetti, a co-worker, who allegedly made an unwelcome sexual advance to plaintiff between January and May 2001; and Manny Bonomo, a supervisory employee of Worldwide, who allegedly initiated a sexual relationship with plaintiff upon a promise of "ameliorating her untenable and discriminatory situation at work." Amended Complaint at ¶16.


1. Plaintiff's Allegations Against Johnny Gonzales

Plaintiff's amended complaint alleges that "[i]n May 2000 and at various times thereafter, Johnny Gonzales, a co-worker in building 79, made fun of [plaintiff], made lewd gestures regarding her physical appearance, and made unwelcome sexual propositions and innuendos [and that plaintiff] reported this behavior to Worldwide but Worldwide did not take corrective action." Amended Complaint at ¶16.

Defendant argues that plaintiff's allegations against Johnny Gonzales do not rise to the level of a hostile work environment. In addition, defendant argues that the June 18, 2001 filing date of plaintiff's EEOC charge renders any claims premised upon acts which occurred prior to

August 22, 2000 untimely under Title VII. Defendant further argues that since all of plaintiff's claims against Johnny Gonzales took place in May-June 2000, they are time-barred as they occurred prior to August 22, 2000. Memorandum of Law Submitted in Support of the Defendant's Rule 56 Summary Judgment Motion (hereinafter "Defendant's Memo of Law" at 6.)

In her deposition, plaintiff states that she first met Gonzales shortly after she began work with Worldwide in April 2000. Her initial impression was that Gonzales felt sorry for her and pitied her because of all of the discrimination she was experiencing. Plaintiff states that Gonzales was one of the few employees who was friendly and not discriminating against, or laughing at, her. Depo. 1 at 74. Plaintiff stated that Gonzales tried to "help" and "teach" her and assisted her when she was having difficulty, such as helping her to file when she sprained her wrist. Depo. 1 at 76.

However, shortly thereafter, plaintiff states that Gonzales "changed" and that he too started to laugh at her. In particular, plaintiff alleges that he laughed at her name, joking that the name "Tatiana" contained that word "tit" or "titty" and then once pointed to his breast area as he made this joke. Depo. 1 at 80. Plaintiff also alleges that "he always asked me to call him," (Depo. 1 at 81), that he made faces at her in a sexual way, (Depo. 1 at 83), and that he stated five times that he wanted to have sex with her. Depo. 1 at 85. Plaintiff further states that she didn't understand at first that Gonzales' behavior was intended to be sexual, and that it was only after she had time to reflect on different conversations, that she realized the conversation contained sexual innuendo. Depo. 1 at 86.

Plaintiff admits that Gonzales told her not to take his joking seriously: "He said don't take serious, he's a joker." Depo. 1 at 87. Despite this behavior, plaintiff admits that she voluntarily

called him outside of work: "[y]eah, when he gave me the beeper, the number, he said call me. I call him. I think what's wrong, because people explain to me. This is America and people give numbers and nothing wrong with call. What's the big deal." Depo. 1 at 88. Plaintiff stopped speaking to Gonzales when he first stopped speaking to her: " I took like he was sorry for me, he joking at me, he laughing of me. I understand because he push me to call me. I understand also not right away, it's later, I start understand because he push me to call me. I said I think no, maybe he want to speak, he cannot speak at work, maybe he wants to tell me something and he show me beeper. What do you call me. You call me on your number. I see. I see. I say yeah, I call you. Why don't you call me? You asked me to call, I don't have the time. I started, I stopped speaking with him. I started ignoring him." Depo. 1 at 89-90.

Plaintiff alleges that Gonzales was coerced into harassing her by a supervisor in order to create a hostile work environment for plaintiff: "[t]he manager or supervisor do it. Push different people act maybe even they don't want it. You understand what I mean . . . If management supervisor do it bad for someone else, different people, co-workers, acting supervisors, they push them also [to make fun of plaintiff]." Depo. 1 at 77-80.

On June 24 or 25 of 2000, approximately two months after plaintiff first met Gonzales, plaintiff complained about him to supervisors Carlton Ramsey and Jean Jacques. Depo. 1 at 94-98. Plaintiff also complained about her other supervisors and managers: "And that moment he [Carlton Ramsey] heard everything how I complain, I even cry over there. And I complain about supervisors. Like Carolyn Jackson, because that time Maria Adma left already and Carolyn Jackson was I complain about her at that time and about group of who was with her." Depo. 1 at 98.

19

While Carlton Ramsey allegedly laughed at plaintiff, Jean Jacques promised to take her complaint seriously. Depo. 1 at 100. Plaintiff states that she believed Ramsey spoke to Gonzales and that thereafter the harassment ceased "for a little while" and for a "period of time it was very quiet." Depo. 1 at 103. Plaintiff admits that she made no other complaint against Gonzales. Depo. 1 at 101.

2. Plaintiff's Allegations Against Frank Leonetti

In January 2001, plaintiff was transferred to building 9 where she alleges co-worker Frank Leonetti made unwelcome sexual advances. Plaintiff alleges that she reported this behavior and that Worldwide did not take corrective action. Amended Complaint at ¶16. Defendant states unequivocally that plaintiff made no complaints about Leonetti, either verbally or in writing. Defendant further argues that plaintiff's allegations against Leonetti, even viewed in the light most favorable to plaintiff, do not make out a claim of a hostile work environment or for *quid pro quo* sexual harassment. Defendant maintains that no adverse employment action was taken against plaintiff and, in any event, liability cannot be imputed to Worldwide for the alleged misbehavior of [Leonetti] because plaintiff did not report any incidents of misbehavior nor did "plaintiff . . . avail herself of the internal mechanisms in place to handle complaints of sexual harassment/hostile work environment." Defendant's Memo of Law at 17.

On May 21, 2001, plaintiff alleges that Leonetti lured her to an isolated warehouse elevator and "opened his zipper on his pants and showed his penis and put his penis on my backside." Depo. 2 at 67. Plaintiff contends that this incident prompted her to file an EEOC charge, however this incident is *not* mentioned in either of plaintiff's EEOC charges or plaintiff's original

20

complaint or amended complaint. Up until this incident, plaintiff had considered Leonetti a "friend at work." Depo. 2 at 77. Plaintiff was "shocked" and thought the incident was "unbelievable" but when she questioned him about this behavior, Leonetti laughed, "[l]ike this kind of demonic laugh." Depo. 2 at 82.

Plaintiff posits that Leonetti, like Gonzales, was prompted and coerced by his superiors to show management and her fellow co-workers that plaintiff was "a dirty woman." Depo. 2 at 84. When questioned how other employees or supervisors could have witnessed this event when, by plaintiff's admission, it occurred in an isolated place with no one around, plaintiff stated that she believed Leonetti gave management a pair of binoculars so they could secretly spy on them. Depo. 2 at 86-87. "Yes, they could see, and then I said that he had a big binocular." Depo. 2 at 86. Plaintiff admits that she did not tell anyone about this incident or report it either verbally or in writing to anyone at Worldwide. Depo. 2 at 87. Plaintiff also admits that she and Leonetti rode home together on three occasions because "we live close in Brooklyn" and it was during these rides that she learned that he had a pair of binoculars. Depo. 2 at 87.


3. Plaintiff's Allegations Against Manny Bonomo

Plaintiff's amended complaint alleges that

> In February 2001, Manny Bonomo, a supervisory employee of Worldwide, initiated a sexual relationship with Ms. Zolondek, with the promise of ameliorating her untenable and discriminatory situation at work. No such amelioration occurred and instead, the discrimination and retaliation intensified in the wake of Ms. Zolondek ending the relationship.

Id. at ¶16.

By Report and Recommendation dated March 17, 2003, I recommended the dismissal of

all claims against Bonomo because plaintiff's claim against him was not included in plaintiff's EEOC charge and was not "reasonably related" to the allegations contained in her original EEOC charges. Judge Dearie adopted my Report and Recommendation on June 16, 2003. As such, all claims against Bonomo have been dismissed.

**The Timeliness of Plaintiff's Claims**

Defendant argues that the June 18, 2001 filing date of plaintiff's first EEOC charge renders any claims premised upon acts which occurred prior to August 22, 2000 untimely under Title VII. If true, plaintiff's claims against Gonzales would be time-barred. Title VII requires a claimant to file a charge of discrimination in New York within 300 days of the alleged discriminatory action. See 42 U.S.C. § 2000e-5(e); Tewksbury v. Ottaway Newspapers, 192 F2d 322 (2d Cir. 1999); Gomes v. Avco Corp., 964 F.2d 1330, 1332-33 (2d Cir. 1992). This statutory requirement is analogous to a statute of limitations. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394, 102 S. Ct. 1127 (1982).

Plaintiff's Title VII claims against Gonzales are time-barred as the events she alleges occurred mostly in April-May of 2000; very few allegations against Gonzales occurred after August 22, 2000. By her own testimony, by May of 2000, plaintiff had already complained to her superiors about Gonzales' behavior, her supervisor had spoken to Gonzales and thereafter the "harassment" ceased.

The remaining allegations are vague at best. Plaintiff testified at her deposition that Gonzales began to harass her again after May 2000: "later on, it's time to come and say to me in my ear nobody listened about her." Depo. 1 at 101. Whatever this exactly means, it is

insufficient to establish a continuing violation of Title VII. Since plaintiff's' claims against Gonzales occurred beyond the 300 day lookback period afforded under Title VII in New York, plaintiff's claims against Gonzales should be dismissed as time-barred. Gomes, 964 F.2d at 1332 (Under the continuing violation exception, the commencement of the statute of limitations is delayed until the last discriminatory act in the continuum).

Plaintiff's Sexual Harassment Claims Against Gonzales and Leonetti

Plaintiff's claims under the New York State Human Rights Law and the New York City Human Rights Law are not time barred however. See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996). Unlike Title VII's 300-day rule, New York's Human Rights Law affords claimants three years to file a claim. N.Y. Civ. Prac. L. & R. 214(2). The Court therefore review the merits of plaintiff's state law claims against Gonzales. Except for the different statutes of limitations, plaintiff's claims under New York's Human Rights Law and Title VII are identical. In addition, "New York courts require the same standard of proof for claims brought under the [Human Rights Law] as those brought under Title VII." Tomka, 66 F.3d at 1304 n.4 (citing Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985)); Van Zant, 80 F.3d at 714. [8]

---

[8]    Title 42 U.S.C. § 2000e-2(a)(1) provides:
It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

New York Exec. Law § 296(1)(a) provides:
It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual,

In order to prevail on a sexual harassment/hostile work environment claim under Title VII, a plaintiff must establish two elements: first, plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult . . . that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367 (1993) (internal quotation marks and citations omitted). Second, plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003); Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002); Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

Plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted). Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275 (1998).

In Harris, the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether a given workplace is permeated with discrimination sufficiently "severe or pervasive" to support a Title VII claim. These factors include: (1) the frequency of the

_____

to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. Harris, 510 U.S. at 23.

The Second Circuit has instructed that the Court should consider the totality of the circumstances to determine whether plaintiff has submitted sufficient evidence to support a hostile work environment claim. See Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) (citing Harris, 510 U.S. at 23). Thus, the factors outlined above must be considered "cumulatively," so that the Court can "obtain a realistic view of the work environment." Id. This includes evaluating the "quantity, frequency, and severity" of the incidents. Id.

Considering these factors, plaintiff's hostile work environment claims must fail. Reviewing the totality of plaintiff's allegations, no reasonable juror could find that plaintiff has established that she was subjected to a hostile work environment. Taken in the light most favorable to plaintiff, plaintiff demonstrated that Gonzales may have acted in a demeaning and inappropriate manner, but his actions were not so severe as to alter the terms and conditions of plaintiff's employment or to create a hostile work environment. Even if Gonzales' actions did rise to the level of a hostile work environment, when plaintiff complained, her supervisors acted reasonably and responsibly and took prompt action to remedy the situation.

Defendant argues that plaintiff's allegations against Leonetti cannot impute liability to Worldwide because plaintiff did not properly avail herself of the internal mechanisms in place to

address complaints of sexual harassment or a hostile work environment.[9] In other words, by failing to complain to anyone about Leonetti's actions on May 21, 2001, plaintiff cannot impute Leonetti's conduct to the employer.[10]

When a co-worker--as distinct from a supervisor--is alleged to have engaged in harassment, the "employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." Quinn v Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998) (quoting Tomka, 66 F.3d at 1305) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer ... knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

On the other hand, employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor. Quinn, 159 F.3d at 767 (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2270 (1998). "However, the employer will avoid liability if it can plead and prove, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise." Id.

---

[9] Although plaintiff states in her amended complaint that she was subject to harassment by Leonetti between January and May 2001, the only allegation againt Leonetti is the May 21, 2001 incident.

[10] The events that plaintiff alleges occurred on May 21, 2001, wherein Leonetti allegedly took plaintiff to a warehouse elevator and exposed himself, are described for the first time in plaintiff's *deposition* and are not mentioned in the complaint, the amended complaint or in her EEOC filings.

Plaintiff admitted in her deposition that she complained to no one about the May 21, 2001 incident with Leonetti.[11] She attributes her failure to complain to the fact that she did not know that she could file a complaint and that in any event, she feared retaliation if she complained. However, plaintiff contradicted these statements at her deposition. Plaintiff was clearly aware that she could complain about sexual harassment because she had complained about Gonzales nearly a year earlier. In addition, plaintiff admitted in her deposition that she was trained how to make complaints about sexual harassment as part of her initial training with the company. Finally, plaintiff, by her own admission, was not afraid of making complaints as she complained to her supervisors constantly, "about everything." Depo. 1 at 113.

In her reply, plaintiff alleges that Leonetti was in fact a supervisor, not a co-worker as he is described in her amended complaint. Plaintiff's amended complaint clearly designates Leonetti as a co-worker, as opposed to Manny Bonomo, whom she designates as a "supervisory employee". Amended Complaint at §16. However, even assuming Leonetti was a supervisor, because she failed to report the incident with Leonetti despite Worldwide's sexual harassment procedures, plaintiff's allegations against Leonetti should be dismissed. See Burlington Indus., Inc. V. Ellerth, 118 S. Ct. at 2270; Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2292-93.

Accordingly, defendant's motion for summary judgment should be granted and plaintiff's sexual harassment claims against Gonzales and Leonetti should be dismissed.

---

[11] In her opposition papers, plaintiff annexes as an exhibit drafts of letters that she "wrote" to Peter Ferrantelli, the Assistant General Manager of JFK, in which she complains about instances of disparate treatment and sexual harassment. Plaintiff's Affidavit/Affirmation in Opposition to Defendant's Motion, Exhibit "F". However, plaintiff admitted in her deposition that she never actually sent the letters to Ferrantelli. Depo. 1 at 204.

**PLAINTIFF'S RETALIATION CLAIM**

In addition to plaintiff's allegation that she was terminated as the result of

retaliation, discussed *infra*, plaintiff filed a charge with the New York Human Rights

Commission, received July 27, 2001, in which she states:

> I am being retaliated against by my employer because I filed charges of sexual harassment
> and charges of discrimination with the EEOC. When I returned to work on July 15, after
> being on leave of absence without pay, the following began to happen. My manager,
> Guido Salvo, told many employees who are with me to watch me constantly. I am being
> watched all day continuously without a stop. (To my knowledge this is not being done by
> others). From time to time they even put their faces into mine. I am also being monitored
> [by] a camera. This camera was placed where I work and in no other direction. The
> following people were told to do this.
> 1. (Annie) Joeyclin Black Female Asst Supervisor; 2. Billy-white male co-worker; 3.
> Tyesha Black Female co-worker; Samira Black Female co-worker.

To establish a prima facie case of retaliation in violation of Title VII, plaintiff must show

that: (1) she participated in an activity protected under Title VII; (2) the employer was aware of

her participation in the protected activity; (3) the employer took adverse action against plaintiff

based on her protected activity; and (4) there was a causal connection between the protected

activity and the adverse action taken by the employer. Tomka v. Seiler Corp., 66 F.3d 1295,1308

(2d Cir. 1995) (citations omitted).

Plaintiff fails to establish a *prima facie* case of retaliation because she has failed to

demonstrate that any adverse employment action was ever taken against her as a consequence of

her complaints about perceived discrimination. Plaintiff posits only that the attitudes of all the

Worldwide employees (both supervisors and co-workers) changed after plaintiff filed the EEOC

charge and that the change was "obvious". Depo. 2 at 38. Even if true, this vague and conclusory

allegation is insufficient to establish an adverse employment action. Although the Supreme Court

28

in <u>Burlington Northern & Santa Fe Railway co v. White</u>, 126 S. Ct. 2405 (2006) recently ruled that "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace" it concluded "that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant . . . the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" <u>Id.</u> at 2409.

Plaintiff's allegations that she was watched all day is insufficient to support a *prima facie* case of retaliation. The employer's actions alleged, that she was watched constantly and monitored by a camera, are not harmful to the point that they could well dissuade a reasonable worker from complaining. <u>Id.</u> at 2415 ("We refer to reactions of a <u>reasonable</u> employee because we believe that the provision's standard for judging harm must be objective.") (emphasis in original). As discussed in the following section, plaintiff was terminated after she failed to report to work for over a week. Moreover, plaintiff alleges no causal connection between her discrimination charge in filed in July and her termination in September. I therefore recommend that defendant's motion for summary judgment should be granted on plaintiff's retaliation claim.

**FAMILY MEDICAL LEAVE ACT**

Finally, plaintiff alleges defendant terminated her in September 2001 in violation of the Family Medical Leave Act (FMLA). Defendant's motion for summary judgment should be granted on this claim.

Although many of the dates surrounding plaintiff's termination are disputed, it is undisputed that on September 10, 2001, plaintiff did not report to work and that plaintiff's

29

husband called and left a recorded message stating that plaintiff would be taking sick leave. Defendant contends that plaintiff's husband provided no further details nor stated that plaintiff would be out of work for any day other than September 10, 2001. Def's Exhibit "S"; Exhibit "K". Defendant alleges that this was the last they heard from plaintiff-- that plaintiff remained out of work and never contacted Worldwide again--until after she was formally terminated by letter dated September 19, 2001. Def's Exhibit "C".

Defendant asserts that plaintiff was formally terminated by letter dated September 19, 2001 because of her consecutive absences beginning on September 10, 2001. Defendant further asserts that plaintiff never requested, orally or in writing, a medical or other leave of absence for this time period and failed to contact Worldwide after September 10 regarding her absences until she received notice that she was terminated. Defendant states its leave of absence policy requires a written request for leave of absence or medical documentation within three days of an absence.[12] In the September 19, 2001 termination letter, defendant states that plaintiff was being terminated for "Job Abandonment" pursuant to Worldwide's attendance policy that "three consecutive no-calls" results in termination. Def's Exhibit "C"; Exhibit "Y".

Plaintiff's complaint alleges that "[o]n or about September 23, 2001, Worldwide, aware that Ms. Zolondek was unable to return to work for medical reasons, and in light of that knowledge, failed to extend her reasonable accommodation, failed to extend to her a medical leave of absence and instead discharged her for failing to report to work." Amended Complaint at

---

[12] Worldwide Rules and Regulations under *Attendance*, no. 2: "Call in when absent and when you expect to be late as far in advance of your scheduled starting time as soon as possible. Three consecutive days absence without advising the company will be grounds for dismissal. Def's Exhibit "V".

¶20.  However, plaintiff does not demonstrate that she made Worldwide aware that she was

unable to report to work: her vague statements that she and/or her husband called Worldwide

several times between September 9 and September 19 , 2001 are insufficient to defeat defendant's

instant motion.

Plaintiff presents no evidence that she requested a medical leave of absence or ever

presented Worldwide with medical documents to support her claim for a medical leave.  In fact,

plaintiff states that she was in the process of applying for *unemployment benefits* after she

received the September 19, 2001 termination letter when she first brought up medical leave to

Worldwide:

> Q:  But in September, at the time that you were leaving, that you terminated from
> the Worldwide in September 2001, did you submit any doctors notes or records
> stating that you needed to take a medical leave of absence?
> A:  Yes, I submitted it to her, the papers from a group of doctors who, it was a note
> from group of doctors recommending me a sick leave.
> Q:  When did you submit these notes?
> A:  I gave them to Dawn when I started, **when I applied for unemployment
> insurance.**
> Q:  So it was after you received the September 19[th] termination letter that we
> referred to?
> A.  My husband was talking to Peter **after we got a termination letter**, saying
> that I needed medical absence leave.  And-
> Q:  All I asked.  Yes?
> A:  And Peter said go and fight with us.  There's nothing to be done.
> Q:  So, in other words, let's put it this way, did you submit any of these doctor's
> notes or letters when you received the termination letter, or was it after that you
> first discussed it?
> A:  It was done verbally.  Nobody asked me to submit this kind of papers.  If they
> did, I would have submitted.
> Depo. 2 at 62-64.

In her opposition, plaintiff argues that she submitted letters and other documentation from

doctors to the defendant stating that she was suffering from job related stress and neck pain in

September of 2001. Plaintiff does attach documents from several doctors dating from June 2001 to May of 2003, several of which refer to plaintiff's job related stress and neck pain in September 2001 as exhibits to her opposition. See Plaintiff's Affidavit/Affirmation in Opposition to Defendant's Motion, "Plaintiff's Opposition", Exhibit "J". However, none of these documents are attached to affidavits of treating doctors. Moreover, plaintiff's deposition testimony establishes that these letters were *never* submitted to Worldwide prior to her termination on September 19, 2001. Plaintiff is bound by the statements in her deposition and her opposition shall be disregarded where it contradicts her sworn testimony. Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997); see Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition should be disregarded on a motion for summary judgment.")

Callender and Salvo (Def's Exhibits "K"& "U") both state that after plaintiff's husband called in sick for plaintiff on September 10, 2001, plaintiff failed to call or report for work and did not call to request a leave or provide any basis or excuse for her absence. Callender avers: " I did not receive any medical documentation or written request for a leave of absence regarding this unexcused absence." Def's. Exhibit "K". Maintenance manager Guido Salvo states in his affidavit: "[o]n September 19, 2001, Ms. Zolondek was terminated for "Job Abandonment. Ms. Zolondek never requested, either orally or in writing, a medical or any other type of leave of absence from me or, to my knowledge, anyone else at Worldwide in September 2001."

Plaintiff states in her opposition that she formally requested FMLA leave and sets forth as an exhibit a letter dated September 22, 2001 that plaintiff allegedly faxed to the defendant requesting leave. See Plaintiff's Opposition, Exhibit "V". The fact that this letter is dated

32

*subsequent* to plaintiff's effective date of termination is fatal to her claim. Plaintiff cannot request FMLA leave *after* her termination. In addition, defendant avers that it never received the letter and that it has no record of this letter in plaintiff's personnel file. See Defendant's Reply Affirmation at 3, fn. 1. However, even assuming *arguendo* that the letter was received, the fact that it is dated after her termination renders the matter moot.

Plaintiff's claims under the Family Medical Leave Act regarding the termination of her employment should be dismissed as plaintiff admitted at her deposition that she spoke to the defendant about a FMLA leave *after her termination and while she was applying for unemployment benefits*. See Moore v. Potter, 353 F. Supp. 2d 410, 414 (E.D.N.Y. 2005) (summary judgment granted where plaintiff did not "comply with employer's usual and customary notice and procedural requirements for requesting leave" under FMLA as required by 29 C.F.R. § 825.302(d)) (citations omitted). As plaintiff never requested leave, there is no evidence to support a FMLA claim and defendant's motion for summary judgment should be granted. Hale v. Mann, 219 F. 3d 61 (2d Cir. 2000) (no evidence to support FMLA leave).

## CLAIMS UNDER STATE LAW AND § 1981

The Second Circuit has found that Title VII and New York State Human Rights Law are essentially identical, save the differing statute of limitations periods. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996). Therefore, with respect to proving a claim, "[t]he elements of a successful employment discrimination claim [under New York and federal law] are virtually identical." Kremer v. Chemical Constr. Corp., 456 U.S. 461, 479 (1982). See also Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993) (finding that plaintiff's claim

33

under New York's Human Rights Law "is governed by the same standards as his federal claim"); Song v. Ives Lab., Inc., 957 F.2d 1041, 1048 (2d Cir. 1992) (noting "New York's wholesale adoption of federal standards in discrimination cases under [its Human Rights Law]").

In addition, the elements that constitute a prima facie case under section 1981 are the same as those in a Title VII claim. See McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1994); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 463 (2d Cir. 1989).

Since plaintiff's Title VII claims for disparate treatment, retaliation and sexual harassment fail as a matter of law, plaintiff's §1981 claim and the mirror-image state-law and municipal-law claims are likewise subject to summary judgment. See Cruz, 202 F.3d at 565 n.1; Bickerstaff v. Vassar College, 196 F.3d 435, 458 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). As such, defendant's motion for summary judgment should be granted with respect to plaintiff's remaining claims arising under § 1981, the New York State and New York City Human Rights Laws.

## CONCLUSION

Accordingly, it is respectfully recommended that the defendants' motion for summary judgment should be granted and plaintiff's action should be dismissed. It is further recommended that the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from a judgment entered herein would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

the parties shall have ten (10) days from service of this Report to file written objections. See also

Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk

of Court. Any request for an extension of time to file objections must be made within the ten-day

period. Failure to file a timely objection to this Report generally waives any further judicial

review. Marcella v. Capital District Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002);

Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); see Thomas v.

Arn, 474 U.S. 140 (1985).


       SO ORDERED.


LOIS BLOOM
United States Magistrate Judge

Dated: August 28, 2006
      Brooklyn, New York